IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ESTATE OF KENDA K. GOULD and CHARLES PATRICK GOULD, <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED STATES OF AMERICA, UNITED STATES FOREST SERVICE, <br><br> Defendant. | CV 20–177–M–DWM <br><br> OPINION and ORDER |

In May 2019, a charred tree fell on an all-terrain vehicle occupied by Kenda and Patrick Gould while they were driving on the West Fork Fish Creek Road No. 7750 ("Road No. 7750") in the Lolo National Forest in northwestern Montana. Kenda was killed and Patrick was seriously injured. On December 4, 2020, Patrick sued the United States under the Federal Tort Claims Act ("FTCA") on behalf of himself and as the personal representative of Kenda's estate (collectively "Plaintiffs"), alleging that the United States Forest Service ("Forest Service") failed to properly survey or maintain the road as to evaluate and prioritize hazards, including trees that were burned during an August 2015 forest fire. (Doc. 1.) The government sought summary judgment on the basis of the FTCA's discretionary function exception. (Doc. 18.) In light of looming trial deadlines, that motion was

1

granted in a brief order on June 28, 2022. (*See* Doc. 35.) This Opinion and Order provides the reasoned justification for that decision.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are material if they have the potential to affect the outcome of the case and there is sufficient evidence for a jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Courts must view all the evidence and draw all justifiable inferences in favor of the nonmoving party without weighing evidence or making credibility determinations. *Id.* at 255.

## BACKGROUND

Because the present motion focuses on the Forest Service's discretion vis-à-vis danger trees,[1] neither party proffers facts regarding the underlying incident. The United States indicates, however, that it "does not dispute the essential facts of the accident—i.e., that a tree fell across Road No. 7750 approximately 3.7 miles from its junction with Fish Creek Road, struck Plaintiffs' side-by-side, and injured Kenda Gould to the extent she passed away several days later." (Doc. 19 at 9.) It

---

[1] The terms "hazard trees" and "danger trees" are used interchangeably. (*See* Doc. 24 at 8 n.1; Doc. 20-10 at 7.)

is also undisputed that in August 2015, the West Fork Fish Creek Fire (the "Fire") burned in the Lolo National Forest, (Doc. 15 at ¶ 4(d)), the tree at issue here was within the fire perimeter but that the Fire was low severity in that area, (Doc. 25 at ¶ 19; Doc. 23-5 at 61; Doc. 20-11 at 69), and the accident occurred on May 25, 2019, (Doc. 15 at ¶ 4(e)). Also, Road No. 7750 provides access to private inholdings, a Forest Service campground, trailheads with stock facilities, and other resources and recreational opportunities. (Doc. 25 at ¶ 24.)

## ANALYSIS

Plaintiffs allege that the tree that fell on their side-by-side was a hazard that the Forest Service negligently failed to mitigate. In response, the Forest Service argues that in the absence of a statute, regulation, or Forest Service directive that mandates a specific course of action with respect to addressing roadside danger trees, Plaintiffs' claim is barred under the discretionary function exception to the FTCA. That argument has merit.

"An action can be brought by a party against the United States only to the extent that the Federal Government waives its sovereign immunity." *Esquivel v. United States*, 21 F.4th 565, 572 (9th Cir. 2021) (quotation marks omitted). If such wavier has not occurred, the court lacks subject matter jurisdiction. *Id.* Under the FTCA, the government has waived its sovereign immunity for specific tort claims, explicitly providing jurisdiction to district courts over:

3

> civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). "The United States and its agents can therefore be held liable with respect to tort claims 'in the same manner and to the same extent as a private individual under like circumstances[.]'" *Esquivel*, 21 F.4th at 573 (quoting 28 U.S.C. § 2674).

Nevertheless, "Congress was careful to except from the Act's broad waiver of immunity several important classes of tort claim." *Id.* (quotation marks omitted). Under the discretionary function exception, which has been invoked here, the United States preserves its sovereign immunity from suit as to

> [a]ny claim based upon an act or omission of an employee of the Government . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). "Congress enacted this exception to prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Esquivel*, 21 F.4th at 573 (quotation marks omitted). Application of the discretionary function exception is subject to a two-step test. *Id.* "First, courts must determine whether the

4

challenged actions involve an 'element of judgment or choice.'" *Id.* (quoting *United States v. Gaubert*, 499 U.S. 315, 322 (1991)). "This inquiry looks at the 'nature of the conduct, rather than the status of the actor' and the discretionary element is not met where 'a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.'" *Id.* (quoting *Berkowitz v. United States*, 486 U.S. 531, 536 (1988)).

If a specific course of action is not prescribed, "the court moves to the second step and must determine 'whether that judgment is of the kind that the discretionary function exception was designed to shield.'" *Id.* at 574 (quoting *Berkowitz*, 486 U.S. at 536). "Namely, the exception protects only government actions and decisions based on 'social, economic, and political policy.'" *Id.* (quoting *Berkovitz*, 486 U.S. at 537). "If the challenged action satisfies both of these two prongs, that action is immune from suit—and federal courts lack subject matter jurisdiction—even if the court thinks the government abused its discretion or made the wrong choice." *Id.* (quotation marks omitted). "The plaintiff has the burden of showing there are genuine issues of material fact as to whether the exception should apply, but the government bears the ultimate burden of establishing that the exception applies." *Id.* (quotation marks omitted). Negligence is irrelevant to this inquiry. *Id.*

Before applying this two-part test here, the Court must identify the specific acts or omissions being challenged. *See GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1174 (9th Cir. 2002). Plaintiffs challenge the Forest Service's failure to: "(1) properly inspect and identify the burnt dead trees that fell on the Goulds' vehicle on Road #7570; and (2) mitigate these hazardous trees prior to May 25, 2019, either by removing them or temporarily closing the road until the hazard was removed." (Doc. 24 at 15.)

I.  **Discretion**

The first inquiry under the discretionary function exception is whether the Forest Service's management of the tree at issue involved an element of judgment or choice. *Esquivel*, 21 F.4th at 574. The Forest Service insists that no statute, regulation, or Forest Service directive prescribes a mandatory, relevant course of action vis-à-vis the mitigation of danger trees. In response, Plaintiffs argue that two road maintenance policies eliminated the Forest Service's discretion: Section 41.6 and Section 41.7(2)(g) of the Forest Service Handbook 7709.59. In their briefing, Plaintiffs point to no other statute, regulation or order as the basis for their challenge. (*See* Doc. 24 at 15–16.) Nevertheless, Plaintiffs' Statement of Disputed Facts lists 33 purported requirements the Forest Service must follow in assessing tree hazards, (*see* Doc. 25 at 3–6), and the cross-references within the Handbook itself implicate Sections 40.3 and 40.5, as well as the other subsections of 41.7.

6

As a matter of brief introduction, the Forest Service Handbook defines "danger tree" as "[a] standing tree that presents a hazard to people due to conditions such as deterioration of or damage to the root system, trunk, stem, or limbs or the direction or lean of the tree." (Doc. 19-1 at 6 (Section 40.5).) A "high-priority danger tree hazard" is "a road or road segments where danger trees are determined to be highly likely to fail and where those failures would be highly likely to cause injuries." (*Id.*) Notably, neither definition provides precise parameters for evaluation. Right out the gate then, this case is distinguishable from the recent Ninth Circuit decision regarding a tree-related death at a campground in Yosemite National Park. *See Kim v. United States*, 940 F.3d 484 (9th Cir. 2019). In *Kim*, the court held that once Park officials undertook to inspect trees in the campground (a discretionary action), they were required to evaluate the risk posed by those trees using a specific "Seven-Point" system (a non-discretionary action). *Id.* at 488. No such system exists here; rather, this case more closely tracks that of *Lam v. United States*, where the Ninth Circuit concluded that although the Army Corp's hazardous tree policies required inspections of its campgrounds, "there is no requirement, checklist, or criteria for how to conduct these inspections or what they should cover." 979 F.3d 665, 679 (9th Cir. 2020). Thus, as argued by the government, the very "threshold identification of a 'danger tree' or 'high-priority

7

danger tree hazard' involves the exercise of a Forest Service employee's judgment[.]" (Doc. 19 at 19.)

As it relates more specifically to Plaintiffs' argument, Section 41.6 provides:

> **Roadway Maintenance** [National Forest System] roadways and roadsides for movement of traffic should be maintained commensurate with the operational maintenance level assigned to the road (ch 6) . . . . Road maintenance includes mitigating danger tree hazards that threaten safe use of the forest transportation system.

(Doc. 19-1 at 7.) Plaintiffs argue that "[t]here is no evidence in the record of a [Forest Service] employee who made any decision regarding the hazard trees that fell and struck the Goulds' vehicle. In other words, there is no evidence that the [Forest Service] inspected these two dead trees and decide [sic] they were not hazardous or decided not to remove them." (Doc. 24 at 15.) Plaintiffs further argue that the Forest Service has no discretion in mitigating hazard trees based on Section 41.7(2)(g), which provides:

> Mitigation of danger tree hazards should always be included as part of an administrative unit's annual program of road maintenance work. In situations where mitigation of tree hazards significantly impact a unit's entire road maintenance program, include specific references to the resources needed for and committed to ongoing mitigation in the annual road maintenance plan (FSM 7732.11).

(Doc. 19-1 at 9.) Plaintiffs' argument misses the mark as to both policies.

As it relates to Section 41.6, the question is not whether a governmental actor exercised his or her discretion here, but rather whether the policy allows for the exercise of discretion. *Lam*, 979 F.3d at 678. To be sure, Section 41.6

8

provides a general requirement for the Forest Service to consider danger tree hazards in its road maintenance activities. The provision does not, however, "specify how to carry out these general requirements." *Id.* at 679. Although Plaintiffs provide no further argument as to how Section 41.6 eliminates the government's discretion, the requirements of "operational maintenance level" and "threaten safe use" are discussed below.

Forest system roads should be maintained "consistent with [the] operational maintenance level assign[ed] to [the] road." (Doc. 19-1 at 7.) There are five different maintenance levels, Level 5 is the highest and roughly corresponds with a paved, two-lane road while Level 1 is the lowest and means the road is closed and not maintained. (Doc. 23-1 at 11.) Level 3, 4, and 5 roads are considered "public roads." (*Id.*) Here, Road No. 7750 is a Level 3 road, (*id.* at 42), which means that it has a gravel surface and is "maintained for passenger cars," specifically a sedan-style vehicle, (*id.* at 11). Level 3 roads are also generally maintained on a three-year rotation as opposed to an annual basis. (*Id.* at 40.) Beyond that, however, Plaintiffs point to no specific guidance or requirements regarding vegetation management on Level 3 roads. *See Morales v. United States*, 895 F.3d 708, 714 (9th Cir. 2018) (explaining that where no specific guidance was provided in the policy "employees were left to exercise their judgment").

The final sentence of Section 41.6 states that "[r]oad maintenance includes mitigating danger tree hazards that threaten safe use of the forest transportation system." (Doc. 19-1 at 7.) While this provision provides no further explanation of what it means for a tree to "threaten safe use," Section 40.3(2) states that forest system roads "should be managed for safe passage by road users, including appropriate management of roadside vegetation involving considerations such as motorist sight distance, clear visibility of road signs, and identification and mitigation of danger trees hazards per section 41.7, paragraph 2." (*Id.* at 4.) In turn, Section 41.7(2) provides:

> a. Danger tree hazards along [National Forest System] roads should be evaluated section by section and should be prioritized as high, medium, or low based on the risk to road users from potential tree failure. Determinations of risk should consider both the probability incidents involving failed trees will occur and the severity of the incidents should they occur.
>
> b. High-priority danger tree hazards (sec. 40.5) are likely to directly cause "considerable adverse effects on public safety" (36 CFR 212.52(b)(2)) and should be addressed as soon as practicable. Action that is deemed appropriate with respect to high-priority tree hazards should not be delayed to accommodate commercial removal of trees. To the extent practicable, mitigate high-priority danger tree hazards along [National Forest System] roads, such as by removing all or part of the trees involved. Close the affected road segment if the hazards cannot be mitigated (sec. 40.3, para. 4).
>
> c. Mitigation of medium-to-low priority danger tree hazards along [National Forest System] roads is not considered time-critical. Strategies utilizing the sale of forest products, including commercial timber sales and land stewardship contracts, may be employed to mitigate danger tree hazards along these roads.

10

   d. The priority of danger tree hazards may increase at trees deteriorate.

   (1) Low-to-medium-priority danger tree hazards along [National Forest System] roads should be monitored, to the extent practicable and feasible, for increases in hazard priority due to tree deterioration. When a danger tree hazard along an NFS road moves from medium to high priority, the guidance in section 41.7, paragraph 2b, applies.

   (2) Where strategies utilizing the sale of forest products are being employed to mitigate danger tree hazards before they become high priority, include in the project file an estimate by a qualified person of the month and year when high priority hazards are likely to occur. To the extent practicable, timber sales should be schedule so as to mitigate the danger tree hazards by that date.

   e. All available methods for mitigation of danger tree hazards should be considered and applied as appropriate to local situations. These methods include but are not limited to commercial timber sales, land stewardship contracts, funds for burned area rehabilitation, sales of firewood for personal use, and expenditure of appropriate funds.

   f. Road maintenance, including mitigation of danger tree hazards, may be subject to a categorical exclusion from analysis and documentation in an environmental assessment or environmental impact statement under certain circumstances . . . .

   g. Mitigation of danger tree hazards should always be included as part of an administrative unit's annual program of road maintenance work. In situations where mitigation of tree hazards significantly impact a unit's entire road maintenance program, include specific references to the resources needed for and committed to ongoing mitigation in the annual road maintenance plan (FSM 7732.11).

(*Id.* at 8–9.) Contrary to Plaintiffs' characterization, this provision is replete with discretionary terminology, such as "should," "appropriate," "to the extent practicable," and "as soon as practicable." In fact, only three phrases in the entire

11

section convey any sort of mandatory action and they themselves are only triggered if a discretionary finding is made in the first instance. (*See* 41.7(2)(b) (close road if mitigation not possible), 41.7(2)(d) (timeline estimate), 41.7(2)(g) (list of resources).) Nor can Plaintiffs rely on "always" to alter the meaning of "should," as "the presence of a few, isolated provisions cast in mandatory language does not transform an otherwise suggestive set of guidelines into binding agency regulations." *Lam*, 979 F.3d at 677 (quoting *Gonzalez v. United States*, 814 F.3d 1022, 1030 (9th Cir. 2016)). Thus, the "mandatory-sounding language" of "should always" "does not overcome the discretionary character of the [Policies]" when read as a whole. *Id.* (quotation marks omitted). As such, the government persuasively argues that Section 41.7(2) has "embedded within it a series of interdependent judgment calls." (Doc. 19 at 20.)

Because neither Section 41.6 nor 41.7(2) "specifically prescribe[] a course of action for an employee to follow" when deciding how to identify or mitigate danger trees, *Berkovitz*, 486 U.S. at 536, the Forest Service's policies enabled employees to exercise their judgment in both assessing and mitigating trees. (*See also* Doc. 19-1 at 8 (Section 41.7(1) stating that in the consideration of potential safety concerns employees should "use common sense and judgment to determine safety deficiencies and the priority for corrective action").) Accordingly, the United States has satisfied the first prong of the discretionary function test.

## II. Policy

The second inquiry is whether the Forest Service's actions reflect "the exercise of judgment grounded in social, economic, or political policy." *Esquivel*, 21 F.4th at 575. So long as the type of action is "rooted in policy, the discretionary function extends to all other conduct 'based upon the exercise or performance' of th[e action]." *Id.* at 576 (quoting 28 U.S.C. § 2680(a)). Thus, Plaintiffs' argument that no policy-based decision was actually made in this case, (*see* Doc. 24 at 18), is irrelevant because the operative inquiry is merely whether "managing trees was susceptible to policy analysis." *Lam*, 979 F.3d at 675. Moreover, when a government agent is afforded discretion, "it must be *presumed* that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324. Plaintiffs therefore face an uphill battle.

Plaintiffs' primary argument is that because the Forest Service's handling of danger trees is a matter of routine maintenance, it involves questions of scientific or technical judgment, not social, economic, or political policy. That argument highlights a confusing and controversial area of discretionary function case law known as the "implementation exception." Under this exception, policy judgments are made at the design stage (when a plan is developed), not at the implementation stage (when a plan is put into action). *See Whisnant v. United States*, 400 F.3d 1177, 1181 (9th Cir. 2005) ("[W]e have generally held that the *design* of a course

13

of governmental action is shielded by the discretionary function exception, whereas the *implementation* of that course of action is not."). Indeed, the Ninth Circuit has consistently recognized that "matters of routine maintenance are not protected by the discretionary function exception because they generally do not involve policy-weighing decisions or actions." *Terbush v. United States*, 516 F.3d 1125, 1133 (9th Cir. 2008); (*see also* Doc. 24 at 18 (collecting cases)).

Nevertheless, the Ninth Circuit has also recognized that the design versus implementation distinction is not a categorical one, *see Whisnant*, 400 F.3d at 1181 (citing *Gaubert*, 499 U.S. at 325–26), and most recently concluded that the Army Corps' decision of whether to cut down a tree in a campground was susceptible to the competing policy considerations insofar as those considerations were specifically outlined in the Army Corps' Operational Management Plan, *Lam*, 979 F.3d at 681–82. Consistent with *Lam* then, the relevant inquiry is whether the government policies at issue require a balancing of competing policy interests, such as natural aesthetics, conservation of natural resources, and/or public safety. *Id.* at 682. The two cases cited by Plaintiffs, *Fernandez v. United States*, 496 F. App'x 704 (9th Cir. 2012), and *United States v. Bolt*, 509 F.3d 1028 (9th Cir. 2007), support that focused assessment. If the government policies at issue reflect such a balancing, then the second prong of the discretionary function inquiry is satisfied despite the implementation exception.

In *Fernandez*, a motorist was injured when his truck struck a tree that fell on a state highway in a national forest. 596 F. App'x at 705. The court concluded that the agency's failure to remove the "previously identified dangerous tree" was not a decision grounded in policy as it "[wa]s merely the implementation of a decision regarding routine maintenance and/or safety." *Id.* at 706. The court clarified that:

> [t]he implementation of a safety measure is not shielded by the discretionary function exception unless the government must balance competing safety considerations, which would make the decision susceptible to policy analysis. The determination of which order to cut down previously identified dangerous trees is routine, requiring only technical or professional judgment about safety and not the balancing of competing safety interests.

*Id.* Similarly, in *Bolt*, the court determined that the Army's failure to remove snow from an on-base residential parking lot was not subject to policy analysis, specifically rejecting the government's argument that the weighing of budgetary constraints was a policy-based decision and emphasizing that "maintenance work is not the kind of regulatory activity to which the Supreme Court envisioned the discretionary function exception applying." 509 F.3d at 1034 (quotation marks omitted). As it relates to safety, the court concluded that the safety considerations were based on established policy, not competing policy concerns. *Id.*

Consistent with the above, Plaintiffs insist that the Forest Service's road maintenance obligations—which include danger tree removal—reflect an

15

*application* of existing policy, not a *weighing* of policy. The government concedes that "there are no competing policy considerations at play when merely implementing a previously established policy." (Doc. 31 at 14 (collecting cases).) Nevertheless, the government maintains that the decision to remove particular trees within the national forest is subject to important competing interests, such as resource allocation: "[t]aking the time to examine roadside trees individually would prevent the Forest Service from meeting its other obligations." (*Id.* at 11.) Although the government misses the mark with this argument, the second prong of the discretionary function test is nonetheless met as discussed below.

The government's framing of the considerations at issue is not persuasive because it, as Plaintiffs argue, highlights budgetary constraints, *Bolt*, 509 F.3d at 1034, and speaks to "scientific judgment, not decisions of social, economic, or political policy," *Whisnant*, 400 F.3d at 1183. Nevertheless, the Forest Service's decision here, at least the threshold decision to identify danger trees, is susceptible to policy analysis. To start, unlike *Fernandez*, it is undisputed that the tree at issue was not previously identified as a danger tree, and that initial identification is subject to more than just technical analysis of how the tree should be removed. The Forest Service Handbook specifically states that agency personnel must consider safety "along with other applicable considerations, such as environmental protection." (Doc. 19-1 at 4, Section 40.3(1).) The tree hazard guidance further

16

provides that employees are to "consider both the probability incidents involving failed trees will occur and the severity of the incidents should they occur." (*Id.* at 8, Section 41.7(2)(a).) Finally, in determining appropriate mitigation, employees should consider "commercial timber sales, land stewardship contracts, funds for burned area emergency rehabilitation, sales of firewood for personal use, and expenditure of appropriate funds." (*Id.* at 9, Section 41.7(2)(c).) In light of these competing policy interests the government must balance in assessing danger trees, the second prong of the discretionary function test is also met.

## CONCLUSION

Considering the previous grant of the government's motion and the analysis provided above, IT IS ORDERED that the clerk is directed to enter judgment consistent with this Court's June 28, 2022 Order (Doc. 35) and close the case file.

DATED this 6th day of July, 2022.

Donald W. Molloy, District Judge
United States District Court